## STATE v. BARKER.

No. 7351.   Decided January 19, 1950.   (213 P. 2d 445.)

Objections to evidence, waiver of, see note, 79 A. L. R. 173.  See, also, 53 Am. Jur. 127.

*J. Vernon Erickson,* Richfield, for appellant.

*Clinton D. Vernon,* Attorney General, *Ferdinand Erickson,* District Attorney, Richfield, *Quentin L. R. Alston,* Salt Lake City, for respondent.

WADE, Justice.

Defendant, Kenneth Joe Barker, appeals from a conviction of carnally knowing a girl between 13 and 18 years of age, claiming that the trial court erroneously allowed the girl's mother to give hearsay testimony of a conversation with the girl, wherein she described the event upon her arrival home about 30 minutes after it had happened.  The

trial court found that this was a spontaneous statement of the facts made by the girl under such great emotional excitement and so near the event that she did not have time to contrive or fabricate a falsehood and therefore it was admissible as a part of the res gestae.

The act allegedly occurred on the evening of April 18, 1948, in a wash off the highway from Cannonville outside of Peter's Creek in Garfield County, Utah. According to the girl's testimony, Allen Clark, Wade Cheynoweth and defendant, a married man, drove to her home in Tropic, Utah, in a jeep, where she accepted Allen's invitation to accompany them to a show. On arrival at the show, Cheynoweth went into the show where he said his girl friend was waiting for him, and the other boys suggested that they drive on to Cannonville where defendant would pick up a girl. On arrival at Cannonville they stopped and defendant left Allen and the girl with the jeep and while waiting for his return Allen "got fresh" with her and she became angry and when defendant returned without a girl, the two boys got in the front seat and she alone in the back seat and with Allen driving, they started for Henrieville to find a girl for defendant. Shortly thereafter, defendant got back with her in the back seat and began "getting fresh" with her as they neared Peter's Creek. She asked Allen to stop, saying she would get out and walk back to Cannonville. Allen said he would turn around and take her back to Tropic but defendant said:

"No, stop and let her get out."

Whereupon Allen stopped the car and she got out and started walking toward Cannonville. The defendant also got out, and according to Allen's testimony, told Allen to go on and pick him up in a little while. The girl further testified that after she had walked for a few seconds, defendant caught up with her and grabbed her by the leg and threw her to the ground on the side of the road and after some scuffling he got her down farther away from the

road and took her shorts off. At this point, Allen who had driven on down the road had returned and she testified that she called to him for help but he refused. The defendant continued to scuffle with her and made a number of indecent assaults and at one time he knocked her down and then by holding one of her hands behind her with one of his hands and with his other hand over her mouth, took her down into a wash where he had intercourse with her.

She testified that after it was over she began to cry and defendant helped her out of the wash and she walked ahead of him to the road where the jeep was parked and Allen and Wade were out looking for them. Then they all got in the jeep and drove her directly home.

On the trial, defendant did not take the witness stand nor produce any evidence, but the girl, her mother and Allen testified for the state. Allen verified the girl's testimony as far as he knew the facts, except that he testified that when he first returned to the scene where he had let her and the defendant out of the jeep that as he drove slowly by them they were about 20 feet off the road apparently having intercourse. That he continued on past them about 50 yards and stopping the jeep and looking back, saw her crawl through the fence and run down through the brush, so he called her to come and get in the jeep but she answered:

"I can't, he won't let me."

He denied that up to that time she had asked him for help, but testified that he then got out of the jeep and went down to where they were and defendant told him to go back to the jeep, which he did, and after waiting a while he returned to where he had left them but they were not there and receiving no answer to his calls, he went back to the jeep and drove to Tropic where he picked Cheynoweth up at the show and returned with him to the place he had left the defendant and the girl. That after getting out of the

jeep and calling to them, they came and all got into the jeep and they took her directly home. Allen estimated that it was 9:00 p. m. when he left the place where the defendant and the girl were to go and get Cheynoweth, and about 10:30 p. m. when they all got into the jeep and started for her home, and that they arrived at her home about 11:00 p. m.

The girl's mother testified that her husband was bedfast and had just gone to sleep when the girl came home and called to her. She first told the girl to go to bed and not wake her father, but when the girl insisted that she needed her now, she got up and when she saw the girl she first thought she had been in a wreck. She further stated that the girl then related what had happened and they immediately called the sheriff and the defendant was taken into custody that night. The mother was then asked, and, over the objection of defendant, related very briefly the story which the girl told her.

Defendant urges that this testimony was erroneously admitted and very prejudicial. It is not necessary for us to pass on the admissibility of this testimony because the defendant had expressly asked the girl what she had told her mother that night and she had answered that she had told her almost exactly as she told it on the witness stand. The story the girl told on the witness stand was the same, only in much more detail than what the mother testified she told her.

The defendant by, on cross-examination, requiring the girl to state what she told her mother that night after she got home, presented to the jury, only in much more detail, the evidence to which he now objects as coming from the mother. Whatever harm, if any, it was capable of doing coming from the mother had already been done when defendant elicited it from the girl on cross-examination. The mere repetition of the same version of that conversation without so much detail could not, thereafter, be prejudicial

to defendant even though the evidence was not admissible as part of the res gestae, which we do not pass upon here. Judgment affirmed.

PRATT, C. J., and McDONOUGH, J., concur.

WOLFE, Justice.

I concur.

If the girl's story as related to her mother was not part of the res gestae, I would think that the defendant might protect himself against a reiteration of it by the mother and thus avoid an increased emphasis on the elements constituting the crime. Basically, I think we must stand on the proposition that the account given by the girl to her mother was under the stress of indignation at the outrage and thus constituted the event speaking through the victim. If there were parts of the narrative related by the daughter to the mother and testified to by the mother which should have been excluded as not constituting matters which were part of the res gestae because not coming within the scope of the guarantee of authenticity, it may be that they should have been excluded if the objection was sufficiently specific. But if such matters were wrongly admitted, I am unable to see how the defendant could have been prejudiced thereby because they were not directly connected with elements of the crime.

For this reason, I prefer to rest my concurrence on the ground that at least that part of the girl's story dealing with the commission of the crime and circumstances under which it was committed revealed through the testimony of the mother as having been related to her by her daughter, was admissible in this case under the res gestae rule. I think the effect of such a harrowing experience and the emotional reaction from it would still be the actuating force which produced the statement to the mother even after an interval of perhaps an hour. This is not the case of a girl waiting to reveal the event until she finds she is pregnant.

It is quite unlikely that she would tell her mother of the happening if she had consented to it. It is far more likely that the actuating force which impelled her to reveal the event to her mother was the emotional stress which the event generated in her and which provides the guarantee of its truthfulness. This is not lost by the intervening of an interval of a half hour or even longer.

LATIMER, Justice.

I concur in the results.

The defendant, on cross-examination, in attempting to impeach the credibility of the complaining witness, attempted to show certain inconsistences in the statements made by her when she first complained to her mother and the statements made by her when she was testifying in court. The state could, therefore, rehabilitate her credibility by introducing evidence to show that the statements on the two occasions corresponded.